## LUMBERMAN'S NAT. BANK v. BUSH & WITHERSPOON CO. (No. 8193.)*

(Court of Civil Appeals of Texas. Galveston. Dec. 6, 1922. Rehearing Denied Jan. 4, 1923.)

1. Pledges ⬅➡4—Bank paying draft and holding bill of lading or warehouse receipt held only pledgee.

Where a bank, paying drafts drawn on a cotton company and holding the bills of lading or warehouse receipts substituted therefor, had been repaid the amounts advanced on certain drafts, it was not the owner or quasi owner of the cotton, for the purchase price of which the drafts were drawn, but only a pledgee, holding the warehouse receipts as collateral for any general balance of indebtedness.

2. Chattel mortgages ⬅➡219—Pledges ⬅➡25 —Sale of property with pledgee's consent waives lien, and purchaser not bound to see proceeds properly applied.

A sale of pledged or mortgaged property and delivery to the purchaser with the pledgee's or mortgagee's consent constitutes, not only a waiver of the lien, as against the purchaser, but relieves the purchaser of the duty of seeing that the proceeds of the sale are paid to the pledgee or mortgagee.

3. Pledges ⬅➡25 — Warehousemen ⬅➡17 — Where bank entrusted warehouse receipts and bills of lading to pledgor to make sale, purchaser properly acquired good title.

Where bank paying drafts drawn on cotton company and holding bills of lading or warehouse receipts substituted therefor, kept such papers in a pouch or wallet, which it turned over to the cotton company daily, to enable it to sell cotton as it saw fit, subject only to the requirement that it deposit the proceeds or put up added margin on its general account, and the warehouse receipts were only indorsed in blank, a sale of cotton, to which the bank held warehouse receipts was with the bank's consent, and gave the purchaser a good title, though the warehouse receipts recited that the cotton represented thereby was deliverable only on return of the receipt.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Action by the Lumberman's National Bank against the Bush & Witherspoon Company. From a judgment for defendant, plaintiff appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, for appellant.

J. D. Williamson, of Waco, for appellee.

GRAVES, J. Appellant bank as plaintiff sued the appellee company in the court below, alleging that it was either the owner of, or held as collateral security for a debt due it by the United States Cotton Corporation, three 100-bale lots of cotton marked, respectively LL, XX, and 44; that such cotton was represented by three certain warehouse or compress receipts, numbered 2188, 2189, and 2190, issued by the Gulf City Compress Company of Galveston to the United States Cotton Company, indorsed by the latter in blank, and held by the bank; that the appellee had wrongfully converted to its own use and benefit 123 bales of such cotton of the then market value of $11,989.68, for which sum, with interest from the date of the claimed conversion, judgment was asked against appellee. It was further averred that the bank had come into possession of these warehouse receipts through the operation of a line of credit it had furnished the Cotton Corporation referred to, whereby it loaned or advanced the latter money with which to buy or make advances to consignors of cotton, accepting as security therefor either bills of lading or warehouse receipts evidencing ownership and possession of the cotton in the cotton corporation, in this manner The shippers of these three 100-bale lots of cotton so marked, in sending them to the cotton corporation, had drawn on it three separate drafts for the purchase price of each lot, with corresponding bills of lading therefor attached, aggregating $23,000, which drafts, under the credit arrangement mentioned, were paid by the bank, and the accompanying bills of lading thereby came into its possession. Shortly thereafter these bills of lading were withdrawn from the bank by the cotton corporation, and, the cotton in the meantime having been delivered to the compress in Galveston, in their place it substituted the warehouse receipts as security for the money advanced for the purchase of the 300 bales "and for other moneys advanced and for moneys to be advanced in the future according to the terms of the agreement between the bank and the cotton corporation."

By paragraph VIII of its trial petition, appellant specifically pleaded the repayment to it of the money it had so furnished for the purchase of this cotton as follows:

"That the United States Cotton Corporation subsequently repaid this plaintiff the amount of money advanced by plaintiff for the account of the cotton corporation in the payment of the three drafts and in the purchase of the 300 bales of cotton aforesaid. At this time the cotton corporation requested that plaintiff, in lieu of the three warehouse receipts hereinabove described, surrender to it their collat-

eral of equal value, and that plaintiff should retain and hold the three warehouse receipts described herein as security for their moneys loaned by plaintiff to the cotton corporation and in lieu of the collateral which plaintiff then and there surrendered to United States Cotton Corporation, which plaintiff did."

In answer to this charge of conversion—

"The appellee pleaded: That the United States Cotton Corporation was engaged in buying and selling cotton, and owned and operated its own compress and warehouse in the city of Galveston, known as the Gulf City Compress. That appellee bought 400 bales of cotton from such corporation. That such purchase and sale was made in due course of trade, and that the cotton was in the possession of and under the control of the United States Cotton Corporation, which had authority to fix the price, sell and deliver such cotton to the purchaser. That the appellant bank had given the cotton corporation every indicia of ownership and the right to trade and sell such cotton, and by reason thereof it was estopped to claim title to the cotton, or claim a lien thereon."

The cause was tried before the court without a jury, who, after rendering judgment in favor of the appellee, filed these conclusions of fact and law:

"(1) That on or about the 16th day of May, 1916, the United States Cotton Corporation was engaged in the business of buying and selling cotton at Galveston, Tex., in the usual course of business, and also handling cotton as factors. That on or about said day and date, it opened an office at Houston to engage in the same line of business, and that it approached the Lumberman's National Bank of Houston with a view of effecting a banking arrangement with such bank.

"(2) That the Lumberman's National Bank agreed with Mr. C. K. Langhammer, the vice president of the corporation, to extend a line of credit in the sum of $100,000, or such further sum as the bank might thereafter agree upon, to the United States Cotton Corporation. Such money was to be used in the purchase of the cotton by the United States Cotton Corporation on its own account. That such money was further to be used to cover such advance as the cotton corporation might make on factorage cotton shipped it by its various customers. That the bank demanded on such cotton bought that the United States Cotton Corporation have a margin of at least $15 per bale on such cotton. That it was understood and agreed that the bank was to hold bills of lading, compress receipts, or warehouse receipts as against the cotton purchased by the United States Cotton Corporation, or upon the money which was advanced to its customers. That such receipts, so to be held by the bank, were to stand as security for the debt due it by the United States Cotton Corporation created as aforesaid.

"(3) That it was agreed between the bank and the cotton corporation that the cotton corporation was to handle and sell all of the cotton that it bought on its own account, and that it was authorized to fix the price and make delivery of such cotton, and to collect the purchase price from the purchaser thereof. The bank expected the cotton corporation, however, to pay over to it the proceeds of any cotton which the corporation might sell, or, if the cotton corporation did not give it the proceeds of the cotton, then to give it other security, so that its indebtedness would be at all times margined and secured.

"(4) That the bank kept the bills of lading, warehouse receipts, and compress receipts, which had been turned over to it, as collateral by the Cotton Corporation, in a separate wallet or pouch. That as a matter of convenience to the bank and the cotton corporation, and in order to facilitate the sale and disposition of cotton by the cotton corporation, that every business day the cotton corporation obtained from the bank this wallet or pouch containing bills of lading, compress receipts and warehouse receipts, and the cotton corporation was authorized to sell any cotton covered by such bills of lading, compress receipts, or warehouse receipts, make delivery thereof, and collect the purchase price. That the cotton corporation was also authorized to exchange collateral in the pouch or to substitute collateral for any collateral in such pouch or wallet, and that the bank did not at any time attempt to maintain the identity of any cotton as against any particular compress receipt or warehouse receipt, but that the bank at the close of the day's business, upon the return of the wallet, would check up the number of bales of cotton shown by the receipts and then figure the market price of cotton as of that date, and then see if its indebtedness was fully covered by collateral, so that it could determine whether to call for additional collateral or ask for a payment upon its indebtedness.

"(5) That in accordance with the above course of dealing that on or about the 27th day of December, 1916, the cotton corporation through one J. C. Bogard purchased 300 bales of cotton at Pine Hill, which was shipped from Timpson, Tex., the 300 bales being in three lots of 100 bales each, and were shipped under bills of lading Nos. 80, 81, and 82; 100 bales of such cotton being marked LL; 100 bales being marked XX; and 100 bales being marked 44.

"(6) That said 300 bales of cotton were shipped to the United States Cotton Corporation at Galveston, Tex. That three drafts were drawn on the United States Cotton Corporation at Houston, Tex., the drafts being in amounts as follows: One draft being for $7,636.67; one draft being for $7,502.73; one draft being for $7,526.03; and all three of the drafts being drawn by J. C. Durand on the United States Cotton Corporation at Houston, Tex., with bills of lading for 100 bales of cotton attached to each of such drafts.

"(7) That said drafts were received by the Lumberman's National Bank in due course of business. That the draft for $7,636.67 with a bill of lading for 100 bales of cotton was first received. That such draft was presented by the bank at the office of the United States Cotton Corporation, the bill of lading detached, the draft accepted and paid by the bank on December 30, 1916. That the other two drafts were received by the bank in the same manner, presented to the United States Cotton

Corporation, the bills of lading detached, the drafts accepted by the cotton corporation, and paid by the bank on January 2, 1917.

"(8) That all three of said bills of lading were surrendered to the bank by the cotton corporation, and held by the bank as collateral until January 3, 1917. On that date the three drafts were obtained by the cotton corporation, so that the cotton represented thereby could be unloaded by the compress of the Gulf City Compress Company. That the bills of lading were surrendered to the railroad, and the cotton unloaded on the compress at Galveston. That the compress company issued three warehouse receipts, each for 100 bales of cotton; in one the cotton was identified as marked LL; in one the cotton was identified therein as being marked XX; and in one the cotton was identified therein as being marked 44. That all of said receipts provided the cotton described was 'deliverable only upon return of this receipt properly indorsed after payment of all charges.' That said receipts were delivered to the bank and placed in the wallet or pouch containing the collateral of the cotton corporation.

"(9) That said receipts were from day to day turned over to the cotton corporation by the bank, as above set forth. That the bank for the warehouse receipts and compress receipts turned over in the collateral, took a trust receipt each day, which was signed by the cotton corporation.

"(10) That at the time of the issuance of all of the compress receipts for the cotton in question, the Gulf City Compress Company was owned by the United States Corporation, and it kept all of its cotton at such compress, and did a general cotton warehouse and compress business.

"(11) That the Gulf City Compress Company was duly incorporated, but that all of its stock was owned by the United States Cotton Corporation, and the cotton corporation showed the Gulf City Compress Company as one of its assets, and the bank knew at all times that the cotton corporation owned the compress.

"(12) The Gulf City Compress Company had an office at the compress, and the United States Cotton Corporation had its office on Strand, in the city of Galveston. The officers of the two corporations were the same.

"(13) That the Lumberman's National Bank held the three drafts so drawn and paid by it as aforesaid from the time they were paid until April 2, and April 11, 1917, respectively. That on April 2d the United States Cotton Corporation made a deposit to its account with the Lumberman's National Bank, and on that day gave the bank a check to cover part of the drafts that it was then holding. The bank selected the oldest drafts it was then holding and in the lot selected, marked paid, and surrendered, was the draft for $7,636.67. That thereafter on April 11, 1917, the cotton corporation having made a deposit and having given the bank a check, the bank selected as among the drafts which were surrendered and marked paid, the draft for $7,502.73, and the draft for $7,526.03, respectively.

"(14) That at the times of the payment of such respective drafts, and the surrender of same, that the bank of its own volition took out such drafts and marked them paid, as they

were the oldest unpaid drafts of the cotton corporation which it held.

"(15) That the bank did not inquire of the cotton corporation relative to the sale of any particular cotton at any time, but that the bank would merely look at the number of bales of cotton, which was represented by its receipts, to see if it had sufficient amount of collateral for its indebtedness.

"(16) That at Galveston, at the time in question, it was not the usual custom for compresses to issue compress or warehouse receipts when cotton was placed at such compress or warehouse by a cotton merchant, but that such receipts were only issued when requested by the particular cotton merchant, as against the particular cotton put in the compress at that particular time.

"(17) That in the delivery of cotton, when cotton was sold by a cotton merchant to a purchaser, that after the cotton was sampled, graded, and weighed, that it was customary for the merchant so selling such cotton to make an invoice of same according to the grade, weight of the cotton, and sale price, and to present such invoice with a delivery order directed to the compress, asking the compress to deliver to the purchaser the number of bales of cotton so sold, and according to the custom existing in the cotton trade in Galveston at that time, the compress would make delivery of the cotton to the purchaser upon such delivery order.

"(18) That if a form of warehouse receipt was issued against any particular cotton, which provided on its face that the cotton was only deliverable upon surrender of the warehouse receipt, that it was usual and customary for the compress or warehouse company to demand the return of that receipt from the seller of the cotton before delivery was made to the buyer.

"(19) That on or about the 21st day of April, A. D. 1917, Bush & Witherspoon made a contract to purchase 400 bales of cotton from the United States Cotton Corporation through two brokers; 200 bales being made through each broker, the brokers being B. Stewart Godwin and Wm. Schneider & Co., both of Galveston. That Bush & Witherspoon, a corporation, had an office at Galveston, Tex., and had an agent in the person of J. K. McKay, and such corporation was engaged in buying cotton for export.

"(20) That the main office of such corporation was at Waco, Tex., where its officers lived.

"(21) That in conformity with the usual custom existing in the cotton trade, that the United States Cotton Corporation gave an order to the Gulf City Compress to set out these 400 bales of cotton to be sampled by Bush & Witherspoon and weighed by a public weigher, and such cotton was sampled by Bush & Witherspoon's classer, and was weighed by the public weigher. That thereafter the United States Cotton Corporation made up its invoice for said 400 bales of cotton in conformity with the purchase price, and presented such invoice together with a delivery order addressed to the Gulf City Compress, directing it to deliver to Bush & Witherspoon Company 400 bales of cotton so identified as set apart. That Bush & Witherspoon Company

paid the full price and market value of said cotton by their checks drawn on Hutchings, Sealy & Co. That the aggregate amount of said checks was $39,275.55, and that the said 400 bales of cotton were delivered to Bush & Witherspoon Company by the compress, and were shipped by it in due course of business, and said purchase and sale was in all respects in conformity with the custom of the market, which was uniform, reasonable, long established, and well known.

"(22) That at the time of the agreement of purchase of such cotton, and at the time of the delivery thereof and payment therefor, that Bush & Witherspoon Company did not know that the United States Cotton Corporation was doing its banking business with the Lumberman's National Bank of Houston, and did not know that the cotton corporation was indebted to said bank in any sum whatever, and did not know that any compress or warehouse receipts had been issued against said cotton so purchased, or any part thereof, and did not know that the Lumberman's National Bank held any such warehouse or compress receipts as collateral as against said cotton, or had any claim thereto whatsoever, and had no notice of such facts.

"(23) That in the cotton so sold to Bush & Witherspoon Company by the United States Cotton Corporation were 57 bales out of the 100 bales marked XX, 47 bales out of the 100 bales marked 44, and 18 bales out of the 100 bales marked LL, making an aggregate of 122 bales of cotton out of the three lots so shipped from Timpson on December 27th, under the marks LL, XX, and 44.

"(24) That the United States Cotton Corporation between April 2, and August 31, 1917, accepted drafts drawn on such corporation through the Lumberman's National Bank, which were given for cotton other than that involved herein to the amount of 1703 bales of cotton, the aggregate amount of such drafts being over $165,000.

"(25) That the Lumberman's National Bank paid said drafts upon same being accepted by the United States Cotton Corporation, and now holds said drafts, the major portion of which are unpaid.

"(26) That the Lumberman's National Bank held as collateral during all of said time, the three compress receipts for 100 bales of cotton each, marked LL, XX, and 44, and held the compress or warehouse receipt issued by the Gulf City Compress Company for 500 bales marked various, of date December 14, 1916, and receipt issued by the Gulf City Compress to the United States Cotton Corporation, on February 2d for 500 bales of cotton marked various, and the compress receipt issued by the Gulf City Compress to the United States Cotton Corporation of date March 3d for 250 bales of cotton.

"(27) That said Lumberman's National Bank had at all times kept such collateral in the pouch where the collateral of the United States Cotton Corporation was kept, and permitted it with the other collateral to be taken out daily by 'the United States Cotton Corporation for the purpose of sale, substitution, or withdrawal of such collateral, and did not at any time inquire of said cotton corporation as to whether or not the particular cotton represented by such collateral was on hand, but

the bank continued its dealings with such cotton corporation upon the faith of holding such collateral.

"(28) That on September 13, 1917, the bank discovered that the cotton corporation had disposed of practically all the cotton represented by the collateral, and then for the first time discovered that the 300 bales of cotton marked XX, 44, and LL had been sold. That thereafter, when it discovered the respective purchasers, it instituted suits against all of such purchasers as to the 300 bales of cotton so marked XX, 44, and LL, and in the suits so instituted was the suit against Bush & Witherspoon.

"Conclusions of law based upon the above facts as found, the court concludes as a matter of law that Bush & Witherspoon were innocent purchasers for value of the cotton in question, and that, by their purchase and payment therefor, they took a good title thereto, and that plaintiff is entitled to no recovery herein."

The bank appeals to this court, attacking paragraphs 3, 4, 10, 16, 17, 21, and 22 of the trial court's quoted fact findings as being contrary to the evidence, its accompanying conclusion of law as being unsound, and strongly contending that it never gave the cotton corporation unlimited authority to sell the cotton, but, by reason of the transfer and delivery to, and the continued holding by, it of the warehouse receipts calling for the particular 300 bales involved under the provision that they were deliverable only upon production and surrender of the receipts, it became and remained either the owner of that identical cotton, or the pledgee of it in at least constructive possession, to such extent that the appellee purchaser could not and did not acquire a title clear of its claims.

After carefully reviewing the statement of facts, we are unable to agree that any of these attacks upon the findings are well grounded, except in part that upon the 10th; as to it, we conclude the evidence fails to show, as stated by the court below, that the cotton corporation actually owned the Gulf City Compress, but only that it owned all the stock of the compress, and that they were separate and distinct corporations, each establishment maintaining apart from the other its individual offices. With that correction, the findings as made below are adopted as those of this court also. Nor do we think the legal result arrived at by the court erroneous, whether or not it is as accurately stated as might be.

[1] The undisputed evidence, indeed that from the bank's own witnesses, substantiated its above-quoted averment that the original purchase price for the cotton it had so advanced on the three drafts had been repaid to it by the cotton corporation, which repayment was made before the sale of the same cotton for full value to the appellee here. This development in the case, as both pleaded and proved by the appellant itself, in our view materially affects the resulting situa-

tion and decidedly simplifies the issues left upon appeal. Having thus gotten back the full amount it advanced the cotton corporation for the purpose of purchasing the cotton, the bank was thereafter by reason of that fact neither the owner of the cotton represented by the warehouse receipts nor in the position of the holder of bills of lading who had paid the purchase price therefor; that is, of a quasi owner, as it so earnestly insists. Therefore, under its own case as made, the bank's only claim against this particular cotton was as a holder of these warehouse receipts as collateral for whatever general balance of indebtedness the cotton corporation then owed it. That being true, it is thought the solution of its relationship lies in the usual rules applicable to pledged property.

[2] As we understand it, the law is settled in Texas that a sale of the pledged or mortgaged property and delivery to the purchaser, with the pledgee's or mortgagee's consent, constitutes not only a waiver of the lien as against the purchaser, but further leaves the latter under no duty of seeing that the proceeds of the sale are paid to the former. Bank v. Ry. Co., 97 Tex. 201, at page 216, 77 S. W. 410; Kempner v. Huddleston, 90 Tex. 182, 37 S. W. 1066; Strange v. Ry. Co., 53 Tex. 170; Lumber Co. v. Meyer (Tex. Civ. App.) 126 S. W. 317; 31 Cyc. p. 816.

[3] That is precisely what the fact findings adopted, which but reflected the undisputed testimony of the bank's officers, show was the situation in this instance. The findings stated clearly import that the cotton corporation here had full power and authority from the bank to fix the price, sell and actually deliver the cotton. For that purpose the bank each day turned over to it warehouse receipts, which amounted to the same thing as possession of the cotton, since they were merely indorsed in blank and not to the order of the bank, in order that it might so sell and deliver. There was therefore no fraud, in so far as the disposition of the cotton to the appellee was concerned, because effected with the bank's consent, and the appellee acquired a good title on account of having paid full value without any knowledge of the bank's claim. The fact that the bank, notwithstanding its direct authorization to the cotton corporation to sell, at the same time expected the latter to either deposit the proceeds of the sale or put up added margin on its general account, was not a matter that concerned the purchaser at such an authorized sale, nor did it become responsible to the bank for any failure on the corporation's part to carry out such an arrangement; it was accordingly not guilty of converting the cotton.

The bank had constituted the cotton corporation its agent in the business and the fraud practiced upon it by the latter lay, not in the sale of the cotton by the corporation to the appellee, because that was effected as the bank had agreed it should be, but in the failure of the agent to faithfully account to its principal for the proceeds of the transaction. The evidence and the findings indicate that this was the result of a collusion with that objective between the cotton corporation and the Gulf City Compress, but, as elsewhere suggested, the appellee, in the absence of any knowledge on its part of the relations between these two concerns and the bank, was in no wise liable or responsible to it for their nonfeasance.

The correctness of these conclusions, we think, is in no wise affected by the fact that the warehouse receipts recited upon their face that the cotton was "deliverable only upon return of this receipt properly indorsed and after payment of all storage and compress charges," for the reason that the receipts themselves were each morning turned over by the bank to the cotton corporation for the express purpose of enabling it to sell and deliver the actual cotton therein called for during the day, not to transfer the receipts; the bank's sole requirement being that each night the proceeds of such daily sale be deposited with it or other collateral to keep the corporation's account with it sufficiently margined be put up. A compelling consideration in this connection is that these warehouse receipts were never indorsed to the order of the bank, but merely in blank, so that the cotton corporation as the possessor of them at the time of this sale had in its own hands the indicia of ownership of the cotton therein described. In other words, the bank did not in any way, in so far as strangers to its relations with the cotton corporation were concerned, impress its claim upon the cotton, but invested its agent both with the power and the means of making such disposition as it saw fit. That this was the undoubted and intended course of dealing, and in pursuance of it the possession of the cotton was never in the bank, but at all times in the cotton corporation, is unequivocally testified to by the bank's officers and employés, the witness Ferrell, who kept for it the account with the cotton corporation, summing up the entire matter in this statement:

"The bank at no time inquired of United States Cotton Corporation as to what particular cotton they were selling or whether they were selling cotton at Houston or Galveston. We knew the proceeds or money we were getting was from cotton that they had and were selling from time to time."

Indeed, upon the case as a whole, we are unable to see that appellant's position is in legal effect any better than that of the holder of a chattel mortgage either unrecorded or, though recorded, leaving the possession and power of disposition in the mortgagor. In either event there would be no right re-

tained as against subsequent purchasers in good faith. R. S. arts. 5654, 5655; Peiser v. Peticolas, 50 Tex. at page 649, 32 Am. Rep. 621.

Further discussion is deemed unnecessary, as what has been said disposes of the merits of the appeal.

All of the assignments presented have been carefully considered, but under the conclusion that none of them should be sustained, the judgment has been affirmed:

Affirmed. ·