**SECHRIST–HALL COMPANY, Appellant,**

v.

**HARLINGEN NATIONAL BANK,**
Appellee.

No. 11095.

Court of Civil Appeals of Texas.

Austin.

May 15, 1963.

Rehearing Denied June 5, 1963.

Johnson, Hester, Jenkins & Toscano, Harlingen, for appellant.

Orrin W. Johnson, Harlingen, for appellee.

ARCHER, Chief Justice.

Appellee, Harlingen National Bank, brought this suit on a note and chattel mortgage against L. O. Luper, mortgagor, and Appellant, Sechrist-Hall Company, as purchaser of the three units of a central air-conditioning system covered by the chattel mortgage, and recovered judgment against said parties jointly for conversion in a trial before the court without a jury for the value of said mortgaged items of $1,131.02 (including interest) and for the amount of appellee's full debt against Luper in the sum of $2,226.46. L. O. Luper has not appealed.

The point on which this appeal is founded is that where appellee bank consented for Luper to sell the mortgaged equipment and collect the proceeds, it waived its right to recover from appellant for conversion and the lower court erred in rendering judgment against appellant.

The Court made findings of fact and conclusions of law, to which no exceptions were taken or objections made.

In brief, the Court found that the note and mortgage were executed and filed for record, and that the total amount due the bank aggregated $2,226.46, and the reasonable value of the three items, describing them, was $1,050.00.

The Court found that the company employed Luper on April 30, 1960 to construct an air-conditioning system by oral agreement, and agreed to pay Luper the costs of materials and equipment and for time and labor; that in May Luper ordered the three items of air-conditioning equipment, describing them; that on June 2, 1960 Luper executed a chattel mortgage to the bank on the three items of equipment. then at the freight depot in Harlingen, and received

from the bank funds to pay a draft covering the purchase price thereof; that the items were movable personal property and not susceptible of being attached to the realty of the company to become a fixture thereto; that the bank did not know that the three items were to go to the company, and did not learn of this until August 8, 1960, when Luper informed the bank that he had sold the equipment to the company, was installing it and would pay the bank when the job was done; that on June 11, 1960 Luper sold the three items to the company and was paid $1000.00, representing that he needed such to get the equipment out of the freight office, and did not inform the company that he had previously executed a mortgage to the bank.

The Court found that the bank amended its pleadings and elected to rely upon the remedy of conversion.

The Court concluded as a matter of law that the three items described in the mortgage were personalty and remained personalty; that the mortgage was properly recorded in the office of the County Clerk, and that the lien was a first and prior one on the personalty in question; that the company, at the time it bought the items had notice of the bank's title as evidenced by the mortgage, regardless of whether or not its officers had actual knowledge thereof.

The Court concluded that the purchase of the equipment by the company accompanied by the denial of the company of the bank's first lien upon the equipment, and the claim of superior ownership by the company in derogation of the rights of the bank constituted conversion of mortgaged property.

Appellant contends that if Luper failed to turn the proceeds of the payment made to him over to the bank that it was not involved in that part of the transaction in any way.

The undisputed testimony in this case is: Mr. Lummus, manager of appellant company testified:

"I can't give the exact day when I made the contract with Luper or made the agreement, which was an oral agreement, with him to supply us with this equipment. It was delivered to our plant sometime the latter part of May or the first few days in June. I couldn't say the exact date, because I have no accurate record of the date it was actually delivered on our premises. However, we issued him a check on June 11, 1960, in the amount of a thousand dollars. This was our check No. 2862, and it was to cover the payment of this equipment. * * *

"A. What happened on this, Luper came to our office on the day of June 11th and asked that we make this initial payment to him in order that he might pay the invoice for this equipment. And that was the reason for the thousand dollars being presented at that time, which was within a few days of the date that the equipment had been delivered to our place of business. The subsequent payment was then paid after the equipment was installed and operating.

"Q. Now, I believe you said that after that fire on April 30th, when you made your deal with Luper, that it was just an oral contract; isn't that right?

"A. That is correct.

"Q. What did you do? Just talk to him? He made an oral bid for the job or something like that?

"A. Actually, as I recall the conversation, we asked him for his recommendations on the size unit for the proposed space that we were rebuilding as an office and he recommended this particular unit. And then we asked him about the price and he said the equipment

would run approximately a thousand dollars, plus his cost of installation, and that the cost of installation would vary somewhat with actual job conditions at the time it was ready.

"Q. Yes.

"A. And since we were somewhat vague as to our planning at that time, we told him to go ahead and order the equipment and we would then work out the details of installation at a later date. So, actually, he did the installation basis on pretty much of a time and material proposition. And the cost of the equipment, of course, as we understood to start with, would cost approximately a thousand dollars."

Mr. Mike Powers, a witness for appellee bank, testified:

"A. Mr. Luper was a customer of our bank and a draft came in for the approximate amount of the note, and he approached us to what we call 'floor plan' the unit until it had been sold. We paid the draft on a bank in San Antonio, and he gave us a chattel mortgage and he described the equipment on the chattel mortgage. * * *

"A. It was probably in the freight yard here. He was taking the money to pay for the unit to get it out of the freight office.

"Q. He had to get paid in order to get it released, in other words? * *

"Q. BY MR. JOHNSON: Now, will you please tell the Court how long you had known Luper, approximately, prior to this time? How many transactions up to that time probably you had been handling of this nature for him?

"A. He began doing business with us in February of '59 and we handled

approximately six or eight similar items for him, the same matter."

The original note and mortgage to the bank was dated June 2, 1960, the note being for $900.00. The mortgage was recorded June 3, 1960. This note was renewed by the bank on August 8, 1960, regarding which Mr. Powers testified:

"Q. As best as you remember it, sir, how did it come that the original note was renewed?

"A. As I recall, he explained to me that he had sold the interest to Sechrist-Hall and was in the process of installing them, and the job hadn't been completed. As soon as the job was completed, then he would be able to pay us. And he asked me to renew the note and thought he could pay it off within sixty days. * * *

"A. Well, he told me that he was waiting to get his money from Sechrist-Hall, and I think there was—he still hadn't completed the job. There was something or other that he was waiting to finish. He gave me some excuse. * *

"Q. Now when do you think it was that you found out that Sechrist-Hall—that Luper had installed this unit in Sechrist-Hall.

"A. Well, he told me, I think, when the note came up for renewal the first time; that he had sold it it to Sechrist-Hall and was installing it; and as soon as the job was completed, they would give him the money and he would pay us off.

"Q. And it was on that basis you dealt with him from then on?

"A. Yes."

Mr. Powers also testified:

"Q. Now, have you ever released the chattel mortgage?

"A. No, sir.

"Q. Did Luper have any authority to sell it without paying the bank?

"A. No, sir.

"Q. In other words, the payment was supposed to go to you if he sold that type of equipment?

"A. That is right. The equipment as collateral on the loan. * * *

"Q. That August 8th note, I believe you testified that you talked to Luper at that time and he did tell you then that it was being installed in the Sechrist-Hall Building and the job was completed was his story to you?

"A. That's what he told me.

"Q. So, at least, you are sure that on August 8th you knew this equipment was going into the Sechrist-Hall Building?

"A. That is right. * * *

"Q. Mike, you had a number of dealings with Luper over a period of time, did you not?

"A. Yes, I did.

"Q. And in these dealings Luper was installing air conditioning equipment as a contractor on various jobs?

"A. Yes, he was.

"Q. And you were financing him on those jobs?

"A. Yes.

"Q. Luper had his own place of business over there?

"A. Yes, he did.

"Q. His own office and warehouse and telephone and name of his business,—

"A. Yes.

"Q. —L. O. Luper Refrigeration, I believe?

"A. Air Conditioning and Refrigeration. * * *

"Q. BY MR. HESTER: I say, in all of these dealings you knew that he was an independent contractor who did these installations in various buildings and you financed him on it?

"A. Yes, sir. * * *

"Q. Now, when you financed this, Mike, did you understand that he was going to display it and sell it?

"A. No. * * *

"Q. What did you understand about the financing of it? When you financed it what did you understand about it?

"A. I understood that it was for sale, of course, to be put—to be sold.

"Q. I see. And, in other words, you were financing the unit that he was then going to offer for sale in the summer?

"A. Right.

"Q. Did you know where he would display it to offer it for sale?

"A. No. I don't think he had a display yet. To my knowledge, he didn't, Darrell. He had his warehouse over there."

The bank did not notify appellant of its mortgage until after October 18, 1960. On October 7, 1960, appellant paid Luper a balance due of $283.30.

It is our opinion that the only reasonable deduction to be made from this undisputed testimony is that the bank consented to the sale of the mortgaged property and that it thereby waived its mortgage lien.

In Lumberman's Nat. Bank v. Bush & Witherspoon Co., 247 S.W. 295, Galveston Civ.App., writ ref., the Court stated:

"As we understand it, the law is settled in Texas that a sale of the pledged or mortgaged property and delivery to the purchaser, with the pledgee's or mortgagee's consent, constitutes not only a waiver of the lien as against the purchaser, but further leaves the latter under no duty of seeing that the proceeds of the sale are paid to the former."

We are also of the opinion that appellee's lien is invalid as to appellant under Art. 4000, Vernon's Ann.Civ.St. Appellant purchased this equipment which was daily exposed for sale, at retail, in good faith and in the regular course of business of Mr. Luper. Donahue Investment Company v. H. E. McMasters Company, 301 S.W.2d 330, El Paso Civil Appeals, writ ref., n. r. e.

The judgment of the Trial Court is reversed and judgment is rendered that appellee take nothing by its suit.